CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
SEP 20 2012
JULIA C. DUDLEY, CLERK
BY:
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| ASHBURY INTERNATIONAL GROUP, INC., | ) ) ) | Civil Action No. 3:11CV00079 |
| Plaintiff, | ) ) ) | **MEMORANDUM OPINION** |
| v. | ) ) ) | By: Hon. Glen E. Conrad Chief United States District Judge |
| CADEX DEFENCE, INC., et al., | ) ) ) | |
| Defendants. | ) | |

Ashbury International Group, Inc. ("Ashbury") filed this patent infringement action, alleging that defendants Cadex Defence, Inc. ("Cadex") and Drake Associates, Inc. ("Drake") implemented the technology claimed by Ashbury in U.S. Patent No. 7,802,392 ("the '392 Patent"). Cadex has moved to dismiss the case for lack of personal jurisdiction and improper venue or, in the alternative, to transfer the case to the Eastern District of New York.[1] For the reasons set forth below, Cadex's motion will be denied.

### Factual Background

Ashbury is a privately held company based in Greene County, Virginia. The company designs and manufactures tactical equipment for use by armed forces of the United States and allied foreign nations. One of the products designed by Ashbury is "a fully integrated precision rifle platform using the advanced SABER®-FORSST® modular stock chassis system and the robust Surgeon-XL-II bolt action receiver." (Compl. ¶ 11.)

Ashbury holds several patents related to its advanced modular chassis system for precision bold action rifle platforms, including the '392 Patent, which was issued in September

---

[1] Following the completion of jurisdictional discovery, Ashbury conceded that the court lacks personal jurisdiction over defendant Drake. Accordingly, Ashbury voluntarily dismissed its claims against Drake, leaving only Cadex as a defendant.

of 2010. In the instant action, Ashbury alleges that defendant Cadex makes, sells, offers for sale, and imports products that directly and indirectly infringe the '392 Patent, in violation of 35 U.S.C. § 271(a), (b), (c), and (g).

Cadex is a Canadian corporation. Its corporate headquarters are in Quebec, Canada. Cadex is not registered to do business in Virginia; has no employees, business records, or bank accounts in Virginia; and does not pay taxes in Virginia. Likewise, Cadex has no Virginia mailing address, telephone number, fax number, or message service.

Cadex has not made or sold in Virginia any of the products accused of infringement. Cadex has, however, sold millions of dollars worth of non-accused products to Virginia-based customers. In 2011 alone, Cadex's sales to Virginia-based customers totaled more than $4.4 million dollars. This equated to over 75 percent of the company's United States sales and over 57 percent of its global sales for that year. From January through June of 2012, more than 36 percent of Cadex's United States sales revenue and over 19 percent of its global sales revenue resulted from Virginia-based sales. All told, Cadex has generated over $5.5 million dollars in sales revenue from Virginia-based customers since 2007, accounting for more than 41 percent of Cadex's United States sales revenue and 23 percent of its global sales revenue.

During the past five years, one of Cadex's largest American, if not global, customers has been the United States Marine Corps Systems Command ("MCSC"), which is based in Quantico, Virginia. Since 2010, the MCSC has purchased over $4.9 million dollars in products from Cadex.

In addition to the MCSC, Cadex has made repeated sales to several other Virginia customers, including Special Tactical Services, Global Supply Solutions, ADS Tactical, Tidewater Tactical, and SEA Systems Group. According to affidavits submitted by Ashbury, Cadex has also actively solicited Virginia-based companies to become distributors of its

2

products.[2] At this time, however, the record contains no evidence indicating that a Virginia-based distributor has been established.

Cadex also produces military catalogs, a portion of which are used for trade shows in Virginia. From 2007 to 2012, seventeen percent of the company's advertising expenses resulted from advertisements sent to, or accessible from, the Commonwealth of Virginia. During the same time frame, the president of Cadex and its United States sales manager traveled to Virginia on several occasions to promote the company's products.

Cadex also operates a website that Virginia residents can access. Although the company's products cannot be purchased on the website, it enables users to contact Cadex representatives. In 2010, approximately ten percent of United States-based visits to the website originated from Virginia; in 2011, approximately six percent of United States-based visits originated from Virginia.

## Procedural History

Ashbury filed the instant action on December 15, 2011. Cadex and Drake subsequently moved to dismiss the case for lack of personal jurisdiction and improper venue or, in the alternative, to transfer venue to the Eastern District of New York, where Drake is based. On May 17, 2012, following a hearing, the court took the defendants' motions under advisement and granted Ashbury the opportunity to conduct discovery on the issue of personal jurisdiction. Upon the completion of limited jurisdictional discovery, Ashbury voluntarily dismissed its

---

[2] For instance, "[o]n several occasions in 2011," Cadex communicated with Tactical & Survival Specialties, Inc. ("TSSi"), a Cadex customer based in Harrisonburg, Virginia, "about TSSi serving as a Cadex distributor in the United States." (Bill Strang Decl. ¶ 8.) Additionally, "Glenn Williams, Cadex's U.S. sales manager, visited TSSi's Harrisonburg headquarters on at least one occasion in 2011 to meet with the TSSi employees and discuss TSSi serving as Cadex's U.S. distributor." (Id.) That same year, Cadex also contacted Ashbury "for the purpose of discussing . . . Cadex's possible employment of Ashbury to serve as a distributor and seller of Cadex products in the United States." (Morris Peterson Decl. ¶ 8.)

3

claims against Drake. Thereafter, both Ashbury and Cadex filed supplemental briefs on the outstanding issues. The court heard additional argument on August 31, 2012.

## Discussion

### I. **Personal Jurisdiction**

The law of the United States Court of Appeals for the Federal Circuit governs the issue of whether a court has personal jurisdiction over a nonresident defendant in a patent case. See Autogenomics Inc. v. Oxford Gene Tech. Ltd., 566 F.3d 1012, 1016 (Fed. Cir. 2009). Ultimately, the plaintiff bears the burden of proving by a preponderance of the evidence the facts necessary to establish personal jurisdiction over the defendant. Pieczenik v. Dyax Corp., 265 F.3d 1329, 1334 (Fed Cir. 2001). However, "[w]here the district court's disposition as to the personal jurisdictional question is based on affidavits and other written materials in the absence of an evidentiary hearing, a plaintiff need only make a prima facie showing that [the defendant is] subject to personal jurisdiction." Elecs. for Imaging, Inc. v. Coyle, 340 F.3d 1344, 1349 (Fed. Cir. 2003). In deciding whether the plaintiff has made the requisite showing, the court must view the facts in the light most favorable to the plaintiff. Deprenyl Animal Health, Inc. v. Univ. of Toronto Innovations Found., 297 F.3d 1343, 1347 (Fed. Cir. 2002); see also Human Res. Certification Inst. v. Human Res. Prof'l Ass'n, 453 F. App'x 349, 350 (4th Cir. 2011) ("When the district court addresses the question of personal jurisdiction on the basis of the motion papers, legal memoranda, allegations in the complaint, and the jurisdictional discovery, the facts are to be viewed in the light most favorable to the plaintiff, and we determine de novo whether the plaintiff made a prima facie showing of personal jurisdiction.").

To establish personal jurisdiction over a nonresident defendant, a plaintiff must show that the forum state's long-arm statute authorizes jurisdiction over the defendant and that exercising jurisdiction over the defendant comports with constitutional due process requirements. See

4

Autogenomics Inc., 566 F.3d at 1016 (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 471-476 (1985)).

### A. Virginia's Long-Arm Statute

The Supreme Court of Virginia has held that "[t]he purpose of our 'long arm statute' is to assert jurisdiction, to the extent permissible under the Due Process Clause of the Constitution of the United States, over nonresidents who engage in some purposeful activity in Virginia." Danville Plywood Corp. v. Plain & Fancy Kitchens, Inc., 238 S.E.2d 800, 802 (Va. 1977). Given the Court's recognition that Virginia's long-arm statute is generally coextensive with the requirements of constitutional due process, the Federal Circuit has held that the statutory and constitutional jurisdictional inquiries merge into the single question of whether due process is satisfied by the court's exercise of personal jurisdiction over the nonresident defendant. See Touchcom, Inc. v. Bereskin & Parr, 574 F.3d 1403, 1411 (Fed. Cir. 2009). Accordingly, the court will focus solely on whether the exercise of personal jurisdiction over Cadex would comport with the applicable due process requirements.

### B. Constitutional Due Process

The due process prong of the personal jurisdiction analysis necessitates an inquiry into whether a defendant maintains sufficient "minimum contacts" with the forum state.[3] In the "canonical" case of International Shoe Co. v. Washington, 326 U.S. 310 (1945), the United States Supreme Court held that a court may exercise jurisdiction over a nonresident defendant only "if the defendant has 'certain minimum contacts with [the forum state] such that the

---

[3] Because subject matter jurisdiction in this case is premised on a federal question, "the Due Process Clause that is at issue here is the Due Process Clause of the Fifth Amendment." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1560 n.1 (Fed. Cir. 1994). Although "[t]he Supreme Court's constitutional jurisprudence of personal jurisdiction . . . includes only state and diversity cases, and thus explicates the demands of the Fourteenth Amendment's Due Process Clause," the Federal Circuit has "nonetheless applied the 'minimum contacts' standard . . . to questions of personal jurisdiction in federal cases, such as those arising under the patent laws." Akro Corp. v. Luker, 45 F.3d 1541, 1544-45 (Fed. Cir. 1995).

maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" Goodyear Dunlop Tires Operations, S.A. v. Brown, 131 S. Ct. 2846, 2853 (2011) (quoting Int'l Shoe Co., 326 U.S. at 316). This requirement "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where the conduct will and will not render them liable to suit." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980).

Since International Shoe was decided, courts have distinguished between "general or all-purpose jurisdiction" and "specific or case-linked jurisdiction." Goodyear, 131 S. Ct. at 2853 (citing Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 414 (1984)). As the Supreme Court recently explained, "[a] court may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the [forum] State are so 'continuous and systematic' as to render them essentially at home in the forum State." Goodyear, 131 S. Ct. at 2851. Specific jurisdiction, on the other hand, exists when the case "aris[es] out of or relate[s] to the defendant's contacts with the forum." Helicopteros, 466 U.S. at 414 n.8. Whether dealing with specific or general jurisdiction, the plaintiff must establish "circumstances, or a course of conduct, from which it is proper to infer an intention to benefit from and thus an intention to submit to the laws of the forum State." J. McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2787, 2780 (2011).

Consistent with the parties' supplemental briefs, the court will focus its analysis on whether Cadex's contacts with Virginia are sufficient to confer general jurisdiction. The standard for establishing general jurisdiction is "fairly high." Autogenomics, Inc., 566 F.3d 1012, 1018 (Fed. Cir. 2009). The court must explore the nature of Cadex's connections with Virginia to determine whether they constitute the type of "'continuous and systematic general business contacts'" necessary to empower this court "to entertain suit against [the company] on

6

claims unrelated to anything that connects [the company] to the State." Goodyear, 131 S. Ct. at 2857 (citing Helicopteros, 466 U.S. at 416). If continuous and systematic contacts are found to exist, the court must also determine whether the assertion of personal jurisdiction would be reasonable. See Elecs. for Imaging, Inc., 340 F.3d at 1351-52.

### 1. Continuous and Systematic Contacts

In applying the "continuous and systematic" contacts test, courts have focused on two areas. First, they look for some kind of deliberate physical presence in the forum state, such as corporate facilities, bank accounts, agents, registration, or incorporation. In this regard, the Supreme Court's decision in Perkins v. Benguet Consol. Mining Co., 342 U.S. 437 (1952) "remains [t]he textbook case of general jurisdiction appropriately exercised over a foreign corporation that has not consented to suit in the forum." Goodyear, 131 S. Ct. at 2856 (internal citation and quotation marks omitted). As the Supreme Court summarized in Goodyear:

> Sued in Ohio, the defendant in Perkins was a Philippine mining corporation that had ceased activities in the Philippines during World War II. To the extent that the company was conducting any business during and immediately after the Japanese occupation of the Philippines, it was doing so in Ohio: the corporation's president maintained his office there, kept the company files in that office, and supervised from the Ohio office "the necessarily limited wartime activities of the company." Although the claim-in-suit did not arise in Ohio, th[e] Court ruled that it would not violate due process for Ohio to adjudicate the controversy.

Id. (internal citations omitted).

In addition to looking for elements of physical presence, courts have also considered whether the defendant has actively solicited business in the forum state and the extent to which the defendant has participated in the state's economic markets. See Tuazon v. R.J. Reynolds Tobacco Co., 433 F.3d 1163, 1172 (9th Cir. 2006) (listing, as indicia of continuous and systematic contacts, "volume," "economic impact," "continuity," and "integration into the state's regulatory or economic markets"). In other words, courts have examined the "economic reality"

7

of the defendant's activities in the forum state. Id. at 1173 (internal citation and quotation marks omitted); see also Trierweiler v. Croxton & Trench Holding Co., 90 F.3d 1523, 1533 (10th Cir. 1996) (cited with approval in Delta Sys., Inc. v. Indak Mfg. Corp., 4 F. App'x 857, 860 (Fed. Cir. 2001)) (listing, as relevant to the general jurisdiction analysis, whether the defendant actively solicits business in the state and the volume of business conducted in the state by the defendant).

In Helicopteros, the Supreme Court considered each of the foregoing areas and concluded that a Columbian corporation was not subject to general jurisdiction in Texas. The corporation's contacts with Texas "[b]asically . . . consisted of sending its chief executive officer to Houston for a contract-negotiation session; accepting into its New York bank account checks drawn on a Houston bank; purchasing helicopters, equipment, and training services from [a Texas enterprise] for substantial sums; and sending personnel to [Texas] for training." Helicopteros, 466 U.S. at 416. After noting the absence of evidence of a physical presence in Texas, such as an agent, a business license, incorporation, or corporate facilities, the Supreme Court also emphasized that the defendant "never . . . performed . . . operations in Texas or sold any product that reached Texas, [and] never solicited business in Texas." Id. at 411. Although the defendant purchased a significant portion of its fleet of helicopters from a company based in Fort Worth, the Court held that "mere purchases, even if occurring at regular intervals, are not enough to warrant a State's assertion of [general] jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions." Id. at 418.

Applying Perkins and Helicopteros in Goodyear, the Supreme Court's most recent decision on the exercise of general jurisdiction, the Court held that North Carolina could not exercise personal jurisdiction over foreign subsidiaries of Goodyear USA that manufactured tires primarily for sale in the European and Asian markets, even though "a small percentage" of [the

8

foreign subsidiaries'] tires . . . were distributed within North Carolina by other Goodyear USA affiliates." Goodyear, 131 S. Ct. at 2852. The Supreme Court rejected the state court's conclusion that placing tires in the "stream of commerce" was sufficient for the exercise of personal jurisdiction over the foreign subsidiaries. Id. at 2855-56. In reaching this conclusion, the court noted as follows:

> In contrast to the parent company, Goodyear USA, which does not contest the North Carolina court's personal jurisdiction over it, petitioners are not registered to do business in North Carolina. They have no place of business, employees, or bank accounts in North Carolina. They do not design, manufacture, or advertise their products in North Carolina. And they do not solicit business in North Carolina or themselves sell or ship tires to North Carolina customers. Even so, a small percentage of petitioners' tires (tens of thousands out of tens of millions manufactured between 2004 and 2007) were distributed within North Carolina by other Goodyear USA affiliates.

Id. at 2852.

The Supreme Court concluded that the state court's reliance on a stream of commerce theory to establish general jurisdiction was misplaced:

> Flow of manufacturers' products into the forum, we have explained, may bolster an affiliation germane to specific jurisdiction . . . . But ties serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has general jurisdiction over a defendant.

Id. at 2855. Ultimately, the Court held that, when measured against Perkins and Helicopteros, the foreign subsidiaries' connections to North Carolina "f[ell] short of 'the continuous and systematic general business contacts' necessary to empower North Carolina to entertain suit against them on claims unrelated to anything that connects them with the State." Id. at 2857. This was true even though a "small percentage" of the foreign subsidiaries' tires was "sporadically" purchased in North Carolina. Id. at 2852, 2856. Relying on its earlier decision in Helicopteros, the Court emphasized that "'mere purchases [made in the forum State], even if occurring at regular intervals, are not enough to warrant a State's assertion of [general]

9

jurisdiction over a nonresident corporation in a cause of action not related to those purchase transactions.'" Id. at 2856 (quoting Helicopteros, 466 U.S. at 418).

Given the high standard set by the Supreme Court and the Federal Circuit, the presence of general jurisdiction in the instant case is admittedly a close question. The record is devoid of many of the factors traditionally associated with a physical presence in the forum state, such as an official agent, employees, a business license, incorporation, or corporate facilities. Nonetheless, at this stage of the proceedings, the court concludes that Ashbury has made a prima facie showing that Cadex is subject to general jurisdiction in Virginia. Construed in the light most favorable to Ashbury, the evidence establishes that Cadex maintains continuous and systematic commercial contacts with the forum state.

The court's decision is based primarily on Cadex's targeted solicitation of Virginia-based customers and the extent to which it has increasingly profited from participating in the state's market for military equipment. In contrast to the defendant in Helicopteros, Cadex has not merely made a "package" purchase of goods and services from a Virginia vendor or accepted a check drawn from a Virginia bank. Helicopteros, 466 U.S. at 418. Likewise, contrary to the defendant in Goodyear, Cadex has done more than simply place a product into the stream of commerce destined for the United States. Instead, over the past five years, Cadex has regularly solicited business in Virginia, derived more than 41 percent of its United States sales revenue from Virginia, and maintained ongoing contacts with numerous Virginia-based customers.

Several of the Virginia-based customers, including the MCSC, Special Tactical Services, and Global Supply Solutions, are repeat customers of Cadex, who purchase products from Cadex year after year. Since 2010, the MCSC has purchased nearly $5 million dollars in products from Cadex, accounting for a substantial portion of the company's sales revenue. Given the

10

company's success in Virginia, it is of no surprise that Cadex has actively attempted to contract with Virginia-based companies to serve as distributors of its products.

In an effort to minimize the significance of the high volume of revenue generated in Virginia as a result of its solicitation efforts, Cadex has focused much of its argument on the fact that a large percentage of the products purchased by the MCSC was ultimately shipped to Marine Corps bases in other states, rather than the MCSC's headquarters in Quantico. While that factor may render this case somewhat unique, the court is unable to agree with Cadex's assertion that it negates a finding of general jurisdiction. Instead, the "economic reality" is that Cadex actively solicits business from the MCSC and other Virginia-based entities, and that without the revenue derived from these entities, Cadex's financial picture would be drastically different. Tuazon, 433 F.3d at 1173 (noting that whether a corporate defendant's contacts in a particular case are substantial and continuous often turns on the "economic reality" of the defendant's activities) (internal citation omitted); see also Eli Lilly & Co. v. Mayne Pharma (USA) Inc., 504 F. Supp. 2d 387 (S.D. Ind. 2007) (exercising general jurisdiction where the defendant "generat[ed] millions of dollars worth of commercial activity in Indiana" through its "targeted marketing efforts").

In sum, viewing all of Cadex's relevant contacts as a whole, and keeping in mind the particular burden faced by Ashbury at this stage of the litigation, the court concludes that it may properly assert general jurisdiction over Cadex. The defendant's commercial contacts with Virginia are sufficiently continuous and systematic that it should anticipate being brought to court in Virginia on causes of action unrelated to its contacts with the Commonwealth.[4]

---

[4] Having reached this decision, the court need not address the issue of specific jurisdiction.

11

## 2. **Reasonableness**

Once the plaintiff has shown that sufficient minimum contacts exist to support the exercise of personal jurisdiction, "it becomes defendant['s] burden to present a 'compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" Elecs. for Imaging, Inc., 340 F.3d at 1351 (quoting Burger King, 471 U.S. at 477). Factors relevant to this inquiry include: "(1) the burden on the defendant, (2) the interests of the forum state, (3) the plaintiff's interest in obtaining relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering fundamental substantive social policies." Id. The Federal Circuit has emphasized that finding jurisdiction unreasonable is "limited to the rare situation in which the plaintiff's interest and the state's interest in adjudicating the dispute in the forum are so attenuated that they are clearly outweighed by the burden of subjecting the defendant to litigation within the forum." Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1568 (Fed. Cir. 1994).

Here, Cadex has failed to demonstrate that the instant case presents the type of rare circumstances in which the exercise of personal jurisdiction would be unreasonable. While it may be more inconvenient for Cadex to litigate in Virginia, "'progress in communication and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome.'" Schwanger v. Munchkin, Inc., No. 99-1049, 1999 U.S. App. LEXIS 25038, at *16 (Fed. Cir. Oct. 7, 1999) (quoting World-Wide Volkswagen, 444 U.S. at 294). Indeed, Cadex's admitted presence at trade shows in Virginia and its trips to visit Virginia customers and solicit potential distributors suggest that the company does not face a particularly onerous burden in defending itself in this state. See Patent Rights Prot. Group, LLC v. Video Gaming Techs., Inc., 603 F.3d 1364, 1371 (Fed. Cir. 2010). When Cadex's burdens are weighed against the other factors set forth above, it cannot be said that Cadex has presented a compelling case that the exercise of

12

personal jurisdiction would be unreasonable. "The Federal Circuit has found that a forum state's interests are not insignificant and include 'providing a convenient forum' for its citizens and 'cooperating with other states to provide a forum for efficiently litigating a plaintiff's cause of action,' which includes patent litigation." Original Creations, Inc. v. Ready America, Inc., 836 F. Supp. 2d 711, 719 (N.D. Ill. 2011) (quoting Patent Rights, 603 F.3d at 1369).

In sum, after weighing the relevant factors, the court is convinced that this is not one of those rare situations in which the interests of Ashbury and Virginia are so attenuated that they are clearly outweighed by the burden of subjecting Cadex to litigation within the Commonwealth. See Patent Rights, 603 F.3d at 1371. The court therefore concludes, at this stage of the litigation, that it may properly exercise general jurisdiction over Cadex, and that Cadex's motion to dismiss for lack of personal jurisdiction must be denied.

## II. Venue

In addition to challenging the court's exercise of personal jurisdiction, Cadex argues that venue is improper under 28 U.S.C. § 1400(b), and that the case should be transferred to the Eastern District of New York, pursuant to 28 U.S.C. § 1406(a). In the alternative, Cadex contends that a transfer of venue is nonetheless warranted under 28 U.S.C. § 1404(a).

Having reviewed the parties' arguments and the existing case law, the court concludes that venue is proper in the Western District of Virginia. Cadex's argument to the contrary is based on 28 U.S.C. § 1400(b), which states that "[a]ny civil action for patent infringement may be brought in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business." 28 U.S.C. § 1400(b). As a foreign corporation, however, Cadex "may be sued in any judicial district," pursuant to 28 U.S.C. § 1391(c)(3). The Supreme Court has expressly held that this provision, rather than § 1400(b), applies to foreign corporations in patent cases. See Brunette Mach.

13

Works, Ltd. v. Kockum Indus., Inc., 406 U.S. 706, 714 (1972) (holding in a patent infringement case against a Canadian corporation that venue was governed by § 1391(d) [now codified at § 1391(c)(3)], rather than by § 1400(b)). Accordingly, the court agrees with Ashbury that Cadex is subject to venue in the Western District of Virginia.

Cadex alternatively seeks to transfer the case to the Eastern District of New York, pursuant to 28 U.S.C. § 1404(a), which provides as follows: "For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Because Cadex is the party seeking transfer, it "bears [the] heavy burden" of establishing that transfer is warranted. Arabian v. Bowen, No. 91-1720, 1992 U.S. App. LEXIS 15624, at *3 (4th Cir. 1992).[5] In deciding a motion to transfer venue, the court may consider a number of factors, including the plaintiff's choice of venue, the convenience of the parties and witnesses, and the interests of justice. Gen. Creation LLC v. LeapFrog Enters., 192 F. Supp. 2d 503, 504 (W.D. Va. 2003). "The plaintiff's choice of forum should rarely be disturbed unless the balance is strongly in favor of [the] defendant." Id. (internal citation and quotation marks omitted); see also Arabian, 1992 U.S. App. LEXIS 15624, at *2 (emphasizing that "[t]he plaintiff's choice of forum is accorded great weight in a motion for transfer under § 1404(a)").

Having carefully considered the applicable factors, the court is unable to conclude that Cadex has met its "heavy burden" of establishing that transfer is warranted. Id. Because Ashbury filed suit in the Western District of Virginia, its home forum, Ashbury's choice of venue is entitled to considerable deference. LeapFrog Enters., 192 F. Supp. 2d at 505; see also Beacon Wireless Solutions, Inc. v. Garmin Int'l, Inc., No. 5:11-cv-00025, 2011 U.S. Dist. LEXIS

---

[5] When deciding whether to transfer venue in a patent infringement action, the court applies the law of the regional circuit in which the court sits. See Storage Tech. Corp. v. Cisco Sys., 329 F.3d 823, 835 (Fed. Cir. 2003).

14

114930, at *12 (W.D. Va. Oct. 5, 2011). Thus, this factor clearly militates against transferring the case to the Eastern District of New York.

To support its request, Cadex focuses primarily on the second factor, the convenience of the parties and the relevant witnesses. This factor, however, favors neither Cadex nor Ashbury. While Cadex argues that two of its key defense witnesses reside in Europe, Cadex has failed to demonstrate that requiring these witnesses to travel to Virginia rather than New York would be unduly burdensome. Moreover, the affidavits of the European witnesses focus solely on convenience and in no way suggest that they would be unwilling to travel to Virginia. "Without evidence that these witnesses are unwilling to testify voluntarily, this factor becomes less important." Rockingham Precast, Inc. v. Am. Infrastructure-Maryland, Inc., No. 5:11cv00024, 2011 U.S. Dist. LEXIS 130885, at *12 (W.D. Va. Nov. 14, 2011). Additionally, given that Ashbury is based in Greene County, the court agrees that transferring the case to the Eastern District of New York would merely transfer the inconvenience of the parties from the defendant to the plaintiff.

The final factor in the transfer analysis is the interest of justice. This factor "encompasses public interest factors aimed at systemic integrity and fairness." Byerson v. Equifax Info. Servs., LLC, 467 F. Supp. 2d 627, 635 (E.D. Va. 2006) (internal citation and quotation marks omitted). "The most prominent elements of systemic integrity are judicial economy and the avoidance of inconsistent judgments," while "[f]airness is assessed by considering factors such as docket congestion, interest in having local controversies decided at home, knowledge of applicable law, unfairness with burdening forum citizens with jury duty, and interest in avoiding unnecessary conflicts of law." Heinz Kettler GmbH & Co. v. Razor USA, LLC, 750 F. Supp. 2d 660, 670 (E.D. Va. 2010).

15

In this case, the court is convinced that the interest of justice weighs in favor of keeping the case in the Western District of Virginia. Ashbury "is a local business and Virginia has an interest in providing a forum for its residents to litigate their disputes." Id. Additionally, "docket conditions, while not a significant factor, favor retaining the case," since statistics reflect that this district provides a speedier trial.[6] Id. Finally, the court harbors no reservations with respect to its ability to adjudicate the plaintiff's patent claims, and Cadex has failed to demonstrate that any of the other elements of systemic integrity and fairness weigh in favor of transferring the case to the Eastern District of New York.

In sum, considering all of the factors relevant to a transfer of venue of analysis, the court concludes that the factors weigh in favor of retaining venue in this district. Accordingly, Cadex's alternative request to transfer venue to the Eastern District of New York will be denied.

## Conclusion

For the reasons set forth above, Cadex's motion to dismiss for lack of personal jurisdiction and improper venue or, in the alternative, to transfer the case to the Eastern District of New York, will be denied. The Clerk is directed to send certified copies of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 20th day of September, 2012.

*/s/ Glen Conrad*
Chief United States District Judge

---

[6] Statistics from September 2011 indicate that the median time from filing to trial in a civil case in the Western District of Virginia was 13.0 months, compared to a median time of 24.8 months in the Eastern District of New York. See Federal Court Management Statistics (September 2011), available at http://www.uscourts.gov/Statistics/FederalCourtManagementStatistics/DistrictCourtsSep2011.aspx.

16